**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **BRITNEY NICOLE LIPSETT,** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | **3:13-CV-01746 (VLB)** |
| | : | |
| **v.** | : | |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **ACTING COMMISSIONER,** | : | |
| **SOCIAL SECURITY ADMINISTRATION,** | : | |
| **Defendant.** | : | **March 7, 2016** |

**MEMORANDUM OF DECISION DENYING THE PLAINTIFF'S MOTION TO REMAND [Dkt. #13] AND GRANTING THE COMMISIONER'S MOTION TO AFFIRM [Dkt. #19]**

I.   **Introduction**

Before the Court is the pPlaintiff, Britney Nicole Lipsett's Motion to Reverse the Decision of the Commissioner which argues that the Commissioner's findings are not supported by substantial evidence in the record as a whole and that the decision was not rendered in accordance with the law.  [Dkt. 13].  In response, the Commissioner has filed a Motion to Affirm the Decision of the Commissioner. [Dkt. 19].  For the reasons discussed below, Plaintiff's Motion to Reverse the Decision of the Commissioner is DENIED.  The Commissioner's Motion to Affirm the Decision of the Commissioner is GRANTED.

II.   **Factual Background**

The following facts are taken from the parties' Joint Stipulation of Facts [Dkt. 29] and are undisputed unless otherwise indicated.

1

### a. *Plaintiff's Background*

Plaintiff was born in January 1992, and has alleged disability beginning on or about July 1, 2006, when the Plaintiff was fourteen years old.  [Id. at 1].  Plaintiff testified that she had completed the tenth grade and had not acquired a GED.  *Id.*  Plaintiff, living at the time in California, had extended contact with the juvenile justice system in that State.  *Id.*  Plaintiff worked part-time for about two months in 2008 as a cashier and held another similar job at Macy's for a brief time in 2010.  *Id.*  In early November of 2009 Plaintiff moved to Connecticut from California along with her boyfriend and their three month old son.  *Id.*  Plaintiff was eighteen years old at the time of her April 5, 2010 application for Supplemental Security Income ("SSI").  *Id.*  At the time of the July 2012 administrative hearing, plaintiff was living with her one-year-old child and the child's father.  *Id.*

### b. *Plaintiff's Medical History*

Plaintiff's first medical record is from Dr. S. George Dresnin at Ventura County Behavioral Health (hereinafter "VCBH") in California, dated October 2, 2008.  [Id. at 2].  The treatment note indicated that Plaintiff reported abuse of alcohol and marijuana.  *Id.*  Plaintiff also reported hearing voices, which the note describes as possibly "confabulating."  *Id.*  Dr. Dresnin's diagnoses were "Mood Disorder not otherwise specified; Parent-Child Relational Problem; Cannabis Dependence; Possible Borderline Intellectual Functioning; and Possible Histrionic Personality Disorder."  *Id.*  Medication was prescribed.  *Id.*  Dresnin

**2**

later diagnosed Plaintiff with "Dysthemic Disorder with Anxiety and Anger."  *Id.*
Plaintiff's GAF was assessed at 40 upon her initial treatment at VCBH.[1]  *Id.*  Upon
her discharge, Plaintiff's GAF was assessed at 58.[2]  [Id. at 4].

Plaintiff was re-referred to VCBH on December 12, 2008 and was said to
manifest a "substance-induced psychotic [illegible], blunt affect, paranoid,
slightly catatonic" with visual hallucinations.  [Id. at 4].  But the following day,
Plaintiff denied hearing voices or having visual hallucinations.  [Id. at 5].  Lab
tests were positive for opioids and methamphetamine.  *Id.*  Dr. Dresnin's
treatment note stated:

> "No gross evidence for hallucinations, was in school, staff reports her
> interactive with peers. In class she appeared attentive and quiet, in this
> interview she revealed hand tremor. Manipulative? Histrionic? Does not
> appear organic."  *Id.*

On July 27, 2009 Dr. Dresnin again saw the Plaintiff and noted that she had
never followed up with psychiatrist and had stopped taking medication.  *Id.*
Plaintiff reported marijuana, alcohol and methamphetamine usage.  [Id. at 6].  Dr.
Dresnin continued to see Plaintiff through January 14, 2010, noting ongoing drug
use and failure to consistently take medication.  [Id. at 7-8].  On two occasions in
December of 2009 and January of 2010, Plaintiff again denied auditory and visual

---

[1] A Global Assessment of Functioning (GAF) Score of 31-40 indicates "Some
impairment in reality testing or communication (e.g., speech is at times illogical,
obscure, or irrelevant) OR major impairment in several areas, such as work or
school, family relations, judgment, thinking, or mood."  *Jerolmon v. Astrue*, 869 F.
Supp. 2d 265, 274 (CSH) (D. Conn. 2012)
[2] A GAF of 51 to 60 indicates "Moderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attacks) OR moderate difficulty in social,
occupational, or school functioning."  *Camille v. Colvin*, 104 F. Supp. 3d 329, 342
(W.D.N.Y. 2015)

hallucinations.  [Id. at 8].  Plaintiff's medications were repeatedly adjusted.  [Id. at 6-9].  The last treatment note from VCBH indicates Plaintiff's diagnoses as "Schizoaffective Disorder, Depressed Type" and "Polysubstance Dependence." [Id. at 8].

By November 9, 2011 the plaintiff, her boyfriend, and their child relocated to Connecticut and were living with her grandmother in East Lyme.  *Id.*  On November 9, 2011, Anna Terryn, LCSW at Middlesex Hospital diagnosed Plaintiff with "Bipolar Disorder and Anxiety Disorder Not Otherwise Specified" and GAF was assessed at 45.[3]  [Id. at 9].  Dr. Richard M. Ketai was then seen on November 22, 2011, with diagnoses of "Bipolar I disorder in addition to social anxiety disorder."  [Id. at 10].  GAF was assessed at 50 and Plaintiff was described as "quite cooperative" and displayed no evidence of psychotic thinking."  *Id.*

On a later visit with Dr. Richard M. Ketai on December 21, 2011, Plaintiff reported that she had stopped taking her medication and had become "increasingly moody, argumentative and angry and she is quite unhappy with the way she is feeling at this point."  *Id.*  Plaintiff's medications were adjusted and new medications prescribed.  *Id.*  On July 2, 2012 medical records indicate that Plaintiff, her child, and her boyfriend had moved out of her grandmother's house and had established Section VIII housing, and Plaintiff's boyfriend was in school to become a medical assistant.  [Id. at 12].  On Plaintiff's most recent medical

---

[3] "A GAF of 41–50 indicates: Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or social functioning (e.g., no friends, unable to keep a job)." *Shaw v. Colvin*, No. 12-CV-0822AF, 2015 WL 1646998, at *4 (W.D.N.Y. Apr. 14, 2015).

visit, she was diagnosed with "Schizoaffective disorder bipolar subtype, rule out schizophrenia . . . History of panic with agoraphobia, history of marijuana dependence sustained full partial remission." *Id.* Plaintiff was found to be "calm, in control of her mood, and exhibiting fair to good insight and judgment." *Id.*

### c. Expert Examinations and Opinions

On July 28, 2010, Rosa Colonna, Ph.D. performed a psychological consultative examination at the request of the State Agency. *Id.* Dr. Colonna wrote that Plaintiff "put forth little effort towards psychometric testing," that she "appears to give up very easily on items even if they are simplistic" and that "[t]herefore, these scores appear to be an underestimation of her ability." *Id.* Thus, although the test results gave Plaintiff a Full Scale IQ of 67, Dr. Colonna opined that plaintiff can, "understand, remember, and carry out short and simplistic instructions without difficulty," and has "a mild inability to interact appropriate[ly] with supervisors, coworkers, and peers" due to 'slight[] social[] immatur[ity].'" *Id.*

On May 7, 2011 the plaintiff was further evaluated by Elmo Lee, a "Board Eligible" MD in the field of psychiatry. [Id. at 13]. Dr. Lee was not provided with any records for review. *Id.* Nonetheless, Lee noted that "[t]he claimant is able to perform her ADLs and her personal hygiene . . . [and] was able to perform simple addition and multiplication and she was also able to do serial 7s without an error using her fingers." *Id.* Dr. Lee concluded that Plaintiff's "psychiatric symptoms are relatively mild even though she is off all of her psychotropic medications, due

to pregnancy.  The claimant's problem is treatable and the likelihood of recovery is fair to good…"  *Id.*  Dr. Lee opined that as long as Plaintiff remained sober, she could perform even "detailed and complex tasks" and that she had no restriction in interacting with supervisors, coworkers, and the public.  *Id.*  Thereafter, the State Agency document-reviewing psychiatrist, Dr. Gold, opined in June 2011 that plaintiff is capable of "simple, repetitive work," that her activities of daily living are "normal" and that she has "moderate limitation in the domains of social functioning and concentration, persistence or pace."  *Id.*

On July 18, 2012, Dr. Steven Wyatt completed a Mental Residual Functional Capacity ("RFC") Statement.  *Id.*  Although the parties describe Dr. Wyatt as Plaintiff's treating physician, Dr. Wyatt had not previously treated the Plaintiff for her psychiatric disorders or any other condition and there is no evidence to indicate that he treated her subsequent to the July 18, 2012 examination.  *Id.*  Rather, Dr. Wyatt based his conclusions on a single 80 minute evaluation and a review of the Plaintiff's medical file.  *Id.*  Dr. Wyatt concluded that the plaintiff would be "off task" for 20% or more of a work day, that she would be absent from work "five days or more per month" as a result of her impairments and/or the need for treatment of them, and that she would be unable to complete a full work day "five or more days per month" for the same reasons.   [Id. at 14].  Further, Dr. Wyatt concluded that Plaintiff could be expected to work at 60% of the capacity of an unimpaired worker and that she was, in his opinion, incapable of obtaining and retaining employment.  *Id.*

### d.  The ALJ's Decision

On July 16, 2012, Plaintiff appeared for a hearing before ALJ James E. Thomas.  [ALJ Hrg. Decision ("Tr.") at 12].  Plaintiff was represented by counsel. Id.  Plaintiff testified that she stayed home most of the day because of her depression and could not work with people because of anxiety, mood swings and problems handling anger and frustration.  [Id. at 14-15].  Plaintiff testified that she could not go to the grocery store, because she had difficulty in situations where she was around large numbers of people.  [Id. at 15-16].  Plaintiff testified that she heard voices.  [Id. at 16].  Plaintiff also testified that she had been sober since about the age of 16, "way before" she became pregnant.  [Id. at 15].

On September 21, 2012, the ALJ issued a decision adverse to plaintiff.  [Tr. at 12].  ALJ Thomas concluded that Plaintiff was not disabled under the Act on the date of the ALJ's decision or at the time of her Application.  ALJ Thomas found that the plaintiff "has the following severe impairments: bipolar disorder; anxiety disorder; and polysubstance dependence (in remission)."  [Id. at 13].  ALJ Thomas found the plaintiff capable of performing "a full range of work at all exertional levels, but with the following non-exertional limitations: The claimant is limited to performing simple, routine, repetitive work with one or two step instructions. The claimant can tolerate occasional interaction with the public, co-workers and supervisors."  [Id. at 15].

The SSA Appeals Council denied plaintiff's request for review, a conclusion which became the final decision of the Commissioner.  *Id.*  Plaintiff then commenced the instant action in this District on November 21, 2013 and the

case was assigned to Magistrate Judge Martinez.  [Dkt. No. 1].  The case was transferred to this Court on July 30, 2015.  [Dkt. No. 21].

### III.   Legal Standard

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir.2012) (internal quotation marks omitted); *see also* 42 U.S.C. § 405(g).  "[S]ubstantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotation marks omitted).  In determining whether the agency's findings were supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983) (per curiam).  If there is substantial evidence to support the determination, it must be upheld.  *Id.*; *see also* 42 U.S.C. § 405(g). The commissioner's determination must be afforded considerable deference. The district Court may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review."  *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984).

IV.    <u>Discussion</u>

To be "disabled" under the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

In order to evaluate disability claims, the Social Security Administration ("SSA") has promulgated the following five-step procedure:

1.    First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity ("Step One").

2.    If she is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits her physical or mental ability to do basic work activities ("Step Two").

3.    If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations ("Step Three").

4.    If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the Residual Functional Capacity ("RFC") to perform her past work ("Step Four").

5.    Finally, if the claimant is unable to perform her past work, the [Commissioner] then determines whether there is other work which the claimant could perform ("Step Five").

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999), *citing* 20 C.F.R. § 404.1520.  In this case, the parties do not contest the ALJ's Step One finding that Plaintiff was not engaged in substantial gainful activity or the ALJ's Step Two finding that the Plaintiff had severe impairments in the form of: (1) bipolar disorder, (2) anxiety disorder, and (3) polysubstance dependence.  [Tr. at 14].

However, Plaintiff argues: (i) that the ALJ's finding at Step Three that Plaintiff did not have a listed impairment is not supported by substantial evidence, (ii) that the ALJ's RFC assessment at Step Four was flawed because the ALJ did not observe the "treating physician rule," (iv) that the ALJ's Step Four determination did not properly credit her own testimony, and (v) that the ALJ's Step Five determination was erroneous because the ALJ did not elicit the testimony of a vocational expert.  The Court considers each argument in turn.

### a. The ALJ's Determination That Plaintiff's Impairments Did Not Meet A Listing Is Supported By Substantial Evidence

Plaintiff first argues that the ALJ substantial evidence did not support the ALJ's conclusion that she did not have a listed impairment.  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990).  The plaintiff bears the burden of showing that an impairment meets the specified criteria.  *Id.*

Specifically, Plaintiff argues that the ALJ's analysis was deficient as to the "Part B" criteria of Listings 12.04 ("Affective Disorders") and 12.06 ("Anxiety Disorders), which may only be satisfied if the claimant can demonstrate at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpt. P, App. 1 §§ 12.04(B)(4); 12.06(B).  A "marked difficulty" is more than a "moderate" difficulty, but less than one that is "extreme."  20 C.F.R. § 404.1520a (setting forth a "five-point scale: None, mild, moderate, marked, and extreme").  Plaintiff argues that the ALJ's analysis of the Part B criteria was "deficient" as to each of the four factors.  The Court considers each in turn.

 "Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."  20 C.F.R Part 404, Subpt. P, App. 1 § 12.00(C)(1).  In this category, the ALJ found only a "mild restriction," noting that Plaintiff is able to live independently with her boyfriend, care for an infant, and has no difficulty attending to personal needs.  [Tr. at 16].  The ALJ noted that Plaintiff had moved with her baby and boyfriend from California to Connecticut during the alleged disability period.  [Tr. at 20].  The ALJ also noted that Plaintiff, while living with her grandmother, was able to walk places, take taxis, and mentioned disliking living in East Lyme because it was "in the middle of nowhere."  *Id.*

Plaintiff argues that the ALJ's reference to her ability to care for her infant was "particularly pernicious," citing to, and including large block quotes from, two opinions written by Judge Posner of the Seventh Circuit rejecting a "casual equating of household work to work in the labor market."  [Pl.'s Mem. at 24, *citing Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005)].  Judge Posner's analysis,

however, was directed to an ALJ's Residual Functional Capacity ("RFC") assessment at Step Four and the Step Five determination of whether jobs exist in the national economy that the claimant can perform.  Plaintiff's authority is plainly inapplicable to her challenge of the ALJ's Step Three determination that she did not have a listed impairment.  On the contrary, the plain text of the regulations *require* the ALJ to consider "grooming and hygiene" as well as "maintaining a residence."  The ALJ's analysis of Plaintiff's daily activities is supported by substantial evidence.

Social functioning refers to the claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals," and includes "the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers."  20 C.F.R Part 404, Subpt. P, App. 1 § 12.00(C)(2).  A claimant may "demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation."  *Id.* The ALJ found that Plaintiff had "moderate difficulties" due to her "anti-social behavioral patterns" as evidenced by her "extensive legal history and history of altercations with others."  [Tr. at 16].  However, the ALJ found that Plaintiff was "able to respond appropriately, carry on a conversation, and does not demonstrate any disruptive behavior."  It is clear in this case that Plaintiff has significant difficulties interacting with others.  At the same time, Plaintiff has maintained a long-term intimate relationship with a boyfriend and has lived without reported incident with her grandmother.  It cannot be said that she

completely avoids interpersonal relationships.  Plaintiff's distress at her remote location in East Lyme also indicates that she does not desire complete social isolation.  Social functioning is the area in which Plaintiff's impairments present the most serious symptoms, but there is evidence to support the ALJ's conclusion, and even if Plaintiff met the criteria for "marked" limitations in social functioning, the Court finds below that she has not presented evidence of marked difficulties in any other category.

"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R Part 404, Subpt. P, App. 1 § 12.00(C)(3).  The ALJ found that Plaintiff had only "moderate limitation" in the category of "concentration, persistence or pace."  Plaintiff argues that the ALJ performed "no analysis here." [Pl.'s Mem. at 26].  The Court disagrees.  The ALJ considered and gave weight to the findings of the consulting examiners that Plaintiff's memory and attention span were only moderately diminished.  [Tr. at 16].  Those examiners noted that Plaintiff was able to perform "serial sevens" a test specifically recommended by the regulations,[4]  that Plaintiff could remember and follow simple instructions, and that Plaintiff put forth little effort in her intellectual testing.  The ALJ's determination of moderate impairment was supported by substantial evidence.

---

[4] The Listings provide that "concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100."  20 C.F.R Part 404, Subpt. P, App. 1 § 12.00(C)(3).

"Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning."  20 C.F.R Part 404, Subpt. P, App. 1 § 12.00(C)(4).  Such episodes "may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household)."  *Id.*  The ALJ found that Plaintiff had experienced no episodes of decompensation.  Plaintiff argues, without citation to authority, that "the period from the alleged onset date to the present . . . has been one extended period of decompensation."  [Pl's Mem. at 28].  While creative, this argument has no basis in fact.  Plaintiff was hospitalized for a period in 2008.  Since then, Plaintiff has been treated on numerous occasions and has on some occasions exhibited more troubling signs than others – particularly with regard to drug use. There is also evidence of numerous adjustments to Plaintiff's medications, indicating an ebb and flow of severe symptoms.  However, Plaintiff has lived independently, has completed a cross-country move and established a family, and has been off her medications for extended periods of time without incident or hospitalization or requiring any "structured" psychological treatment or residence care.  The ALJ's determination as to decompensation is supported by substantial evidence.

The court concludes that the ALJ's determination that Plaintiff failed to meet her burden of showing that her impairments met the listed criteria is

supported by substantial evidence.  Therefore, the Motion to Reverse on this ground is DENIED.

### b. *The ALJ's Decision Not To Apply Treating Physician Rule In Determining Plaintiff's Residual Functional Capacity Is Supported By Substantial Evidence*

Residual functional capacity ("RFC") is "what an individual can still do despite his or her limitations."  *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis."  *Id.* RFC is "an assessment based upon all of the relevant evidence . . . [which evaluates a claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions."  20 C.F.R. § 220.120(a).

Plaintiff argues that the ALJ's Step Four determination that she "has the residual functional capacity to perform a full range of work at all exertional levels but. . . limited to performing simple, routine, repetitive work with one or two step instructions" failed to properly consider her treating physician's conclusions. Specifically, Plaintiff argues that the ALJ erred in affording only "little weight" to Dr. Wyatt's opinion that Plaintiff was "incapable of obtaining and retaining employment."  [Pl.'s Mem. at 18-22].

The Commissioner responds by noting the ALJ's concerns with the fact that Dr. Wyatt only examined Plaintiff on one occasion, with at least one of Dr. Wyatt's diagnoses being inconsistent with the medical record and with his

conclusion about Plaintiff's behavioral problems lacking support from the treatment notes of prior treating physicians.

"[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Mariani v. Colvin*, 567 F. App'x 8, 10 (2d Cir. 2014) (holding that "[a] treating physician's opinion need not be given controlling weight where it is not well-supported or is not consistent with the opinions of other medical experts" where those other opinions amount to "substantial evidence to undermine the opinion of the treating physician").

"The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion." *Schrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009) (*citing Schupp v. Barnhart*, No. Civ. 3:02CV103(WWE), 2004 WL 1660579, at *9 (D. Conn. Mar. 12, 2004)). It is "within the province of the ALJ to credit portions of a treating physician's report while declining to accept other portions of the same report, where the record contained conflicting opinions on the same medical condition." *Pavia v. Colvin*, No. 6:14-cv-06379 (MAT), 2015 WL 4644537, at 4 (W.D.N.Y. Aug. 4, 2015) (*citing Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). In determining the amount of weight to give to a medical opinion, the ALJ

considers the examining relationship, the treatment relationship, the length of treatment, the nature and extent of treatment, evidence in support of the medical opinion, consistency with the record, specialty in the medical field, and any other relevant factors.  20 C.F.R. § 404.1527.

In this case, the ALJ provided three reasons for discounting Dr. Wyatt's opinion.  First,  the ALJ recognized that Dr. Wyatt only examined plaintiff on one occasion, and found that because of this single examination, "the rational[e] for according controlling weight is not present."  [Tr. at 20].  The importance of this point cannot be overstated.  In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, the Supreme Court considered whether the "treating physician rule" should be applied in ERISA cases.  Debunking "the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants," Justice Ginsburg noted that the rationale supporting such an assumption would "make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration."  *Id.* at 832 (2003); *see also Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) (holding that "ALJs should not rely heavily on the findings of consultative physicians after a single examination").  There can be no shorter duration of treatment than a single examination.  In effect, the treating physician simply becomes the Plaintiff's – or the Plaintiff's attorney's – preferred litigation consultant or trial expert, and there is no logic behind affording one such consultant greater weight than another purely on the basis of which party has solicited the consultant's services.

But the ALJ was also not required to give equal weight to the opinions of the three consultant examiners in this case.  "State agency medical and psychological consultants ... are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." *Tyson v. Astrue*, 2010 WL 4365577, at *10 (D. Conn. June 15, 2010), report and recommendation adopted, 2010 WL 4340672 (D. Conn. Oct. 22, 2010)(*citing* 20 C.F.R. § 404.1527(f)(2)(I)). "As the Second Circuit has held, the opinions of non-examining sources can override the treating sources' opinions provided they are supported by evidence in the record." *Id. (citing Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993)).

In the instant case, the ALJ afforded greater weight to one of the two State Agency consultants, Dr. Colonna,[5] after finding that her opinion was "consistent with the evidence as a whole, including . . . the findings in the treatment records that the claimant is depressed but generally stable."  [Tr. at 20].  By contrast, the ALJ found that Dr. Wyatt's opinion that Plaintiff was incapable of obtaining or retaining work was inconsistent with the evidence presented.  *Id.*  In particular, the ALJ noted that "psychological treatment notes frequently indicate mild symptoms" and that this was the case "even when [Plainitff] had to be off her psychotropic medications for nine months while pregnant."  *Id.*  The fact that Plaintiff was entirely stable while off her medication for a lengthy time period is a significant indicator of the severity of her impairments.  The Court finds that the

---

[5] The Court notes that the ALJ also discounted the opinion of the State Agency psychiatric consultant Dr. Lee, after noting that Dr. Lee's finding that Plaintiff could perform "detailed and complex" tasks was inconsistent with the treatment notes as well as with Dr. Colonna's testing.  [Tr. at 20].

ALJ properly considered this fact as undermining Dr. Wyatt's conclusions.

In addition, the ALJ noted that Dr. Wyatt accepted plaintiff's self-report of persistent derogatory auditory hallucinations, but that the presence of such hallucinations had been repeatedly denied by Plaintiff throughout the treatment notes.[6]  Again, the ALJ properly considered this to be a significant inconsistency in Dr. Wyatt's assessment.

The court concludes that the ALJ's decision to not give Dr. Wyatt's report and conclusions controlling weight is supported by both substantial evidence and the rationale behind the "treating physician rule."  The court also concludes that substantial evidence supports the ALJ's reliance on the opinions of state agency consultants in reaching his ultimate Step Four determination.  Therefore, Plaintiff's Motion to Reverse on this ground is DENIED.

### c. The ALJ's Determination as to Plaintiff's Credibility Is Not "Patently Unreasonable"

Plaintiff also argues that the ALJ's decision regarding her RFC at Step Four failed to properly credit her own testimony that she is "unable to work in any capacity due to her bipolar disorder . . . which causes her difficulty in being

---

[6] Plaintiff argues that a claimant's "subjective" report of pain "may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence."  *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979).  However, the ALJ did not discount Dr. Wyatt's opinion simply because he relied on a subjective report of hallucinations.  Rather, the ALJ discounted Dr. Wyatt's opinion because Plaintiff's report of hallucinations during his single examination was inconsistent with numerous prior treatment notes in which she had denied such hallucinations.  The ALJ determined that Dr. Wyatt's reliance on a self-report that was directly contravened by prior treatment notes undermined the credibility of his opinion.

around people due to panic attacks and mood swings" and is not supported by substantial evidence.

The ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ's "finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988). The "ALJ's credibility determination is generally entitled to deference on appeal." *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013).

In this case, the ALJ noted that Plaintiff testified that she had been fired from her job as a cashier at Macy's, but that Plaintiff had earlier reported to a treatment provider that her job had been seasonal and that she had quit on her own. [Tr. at 18]. The ALJ noted Plaintiff's poor effort during psychological testing as a factor not enhancing her credibility. *Id.* The ALJ noted that Plaintiff's psychiatric symptoms after her move to Connecticut had been reported as relatively mild, even when Plaintiff discontinued medication for extended periods of time. [Id. at 19]. The ALJ also noted that Plaintiff testified to experiencing auditory hallucinations despite repeatedly denying such hallucinations in the past and treatment notes indicating a lack of psychotic thinking or behavior. *Id.*

Plaintiff argues that these observations are, variously, "irrelevant," or "a virtual non-sequitur" or "hardly a shock." Plaintiff's arguments, however, go to the weight of the evidence, a function within the discretion of the ALJ. The court

concludes that the ALJ "weigh[ed] the credibility of the claimant's testimony in light of the other evidence of record," *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010), and determined that her testimony was not fully credible – a determination supported by substantial evidence. Therefore, Plaintiff's motion to reverse on this ground is DENIED.

### d. The ALJ's Residual Functional Capacity Evaluation Is Supported By Substantial Evidence

"At Step Five [of the evaluation process], the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform.  An ALJ may make this determination either by applying the Medical Vocational Guidelines (referred to by social security specialists as the "Grids" or "Grid") or by adducing testimony of a vocational expert."  *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (*citing* 20 C.F.R. § 404.1520(a)(4)(v)).

Plaintiff argues that the ALJ improperly relied upon the Medical-Vocational Guidelines to find that jobs existed in the national economy in significant numbers that Plaintiff could perform.  Plaintiff argues that because the Grids "do not take into account non-exertional impairments, the Commissioner cannot use them to find non-disability when depression, mood disorder, anxiety and schizoaffective disorder reduce the ability to perform jobs of which the plaintiff may be otherwise exertionally capable."  [Pl.'s Mem. at 32].  Plaintiff further argues that "the ALJ's failure to call upon the vocational witness for testimony was error."  *Id.*

To the contrary, "the mere existence of a nonexertional impairment does not automatically . . . preclude reliance on the [Medical-Vocational G]uidelines." *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986). *Id.* ALJs must apply the Grids on a case-by-case basis, and if the Grids accurately reflect a claimant's limitations, then an ALJ may solely use them in assessing the availability of jobs that the claimant can perform. *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986). "Vocational expert testimony is required only if a claimant's nonexertional limitations . . . significantly limit the range of work permitted by his exertional limitations." *Lewis v. Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) (internal quotations omitted). A significantly limiting nonexertional impairment must "so narrow a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010)

Plaintiff cites no authority or support in the Record for the proposition that Plaintiff's bipolar disorder so narrowed the range of her possible work as to deprive her of a meaningful employment opportunity. Plaintiff argues that the RFC limitation of "simple routine, repetitious work with one or two step instructions" limits her to jobs that have a reasoning level of "one" in the Dictionary of Occupational Titles ("DOT"). [Pl's Mem. at 31-32]. The Commissioner counters that "an RFC limitation to "short, simple instructions" is not inconsistent with jobs that have a reasoning level either of two or three." [Def.'s Mem. at 25, *citing Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 408-09 (D. Conn. 2012) (collecting cases), *aff'd*, 515 F. App'x 32 (2d Cir. 2013)]. The dispute is simply not dispositive, however, as the Commissioner points out that "the DOT

**22**

identifies 819 distinct occupations that are classified at the reasoning level of one." [Def.'s Mem. at 25, n. 15]. Plaintiff's argument that a level one classification "substantially reduces the already constricted occupational base of unskilled work" misses the mark. Any claimant with serious nonexertional limitations is going to have a "substantially . . . constricted" occupational base – the question is whether the claimant has such a narrow available range as to be deprived of a meaningful employment opportunity. Plaintiff has submitted no evidence that she is within so narrow a range. Courts in this Circuit have noted that claimants with moderate limitations to social functioning can still access and maintain a range of unskilled employment. *See, e.g.*, *Calabrese v. Astrue*, 358 F. App'x 274, 276-77 (2d Cir. 2009); *Rivera v. Colvin*, No. 3:13-cv-709-JGM, slip op. at 22-23 (D. Conn. Apr. 22, 2014)

The court is satisfied that the ALJ's conclusion that Plaintiff can perform unskilled work at all exertional levels is supported by substantial evidence. Therefore, Plaintiff's Motion to Reverse on the ground that the ALJ's Step Five determination is flawed is DENIED.


## V.   Conclusion

For the foregoing reasons, Plaintiff's Motion to Reverse the Decision of the Commissioner is DENIED. The Commissioner's Motion to Affirm the Decision of the Commissioner is GRANTED.   The Clerk is directed to CLOSE this case.


IT IS SO ORDERED.

_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: March 7, 2016**